867 F.2d 609
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Robert REMUZZI; Rachael Remuzzi, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 88-2514.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 2, 1988.
Decided: Jan. 17, 1989.
 
 F. Brook Voght (Martin Scully, Jr., Miller & Chevalier, Chartered, on brief), for appellants.
 Charles Bricken (William S. Rose, Jr., Assistant Attorney General, Gary R. Allen, Richard Farber, Tax Division, Department of Justice, on brief), for appellee.
 Before HARRISON L. WINTER, Chief Judge, and WIDENER and MURNAGHAN, Circuit Judges.
 
 
 1
 The Remuzzis appeal from the Tax Court's decision holding them liable for tax deficiencies of $10,722.93 in 1980 and $15,857.03 in 1981. They filed joint returns in 1980 and 1981 claiming certain business deductions for expenses associated with their cattle farm. Dr. Robert Remuzzi is an orthopedic surgeon; his wife Rachael Remuzzi is a housewife. They and their five children reside in Leesburg, Virginia on a 74 acre farm named Fairleigh Farm.
 
 
 2
 The Remuzzis became interested in the amenities of farm living shortly after moving to Leesburg in 1974, where Dr. Remuzzi began his medical practice. In early 1976, Dr. Remuzzi treated Llewellyn Payne ("Payne"), who was then a tenant on a farm near Middleburg, Virginia. After discussions about Dr. Remuzzi's desire to live on a farm, he and Payne made the following agreement. Dr. Remuzzi lent Payne $15,000 and Payne agreed to become a tenant on Dr. Remuzzi's farm when he purchased a suitable property. Payne was to repay his loan by giving Dr. Remuzzi half of the calves born to the herd until the fair market value of the calves equaled the amount of the loan.
 
 
 3
 Dr. Remuzzi purchased the farm property in Leesburg in May of 1978 for $360,000. It consisted of 35 acres of open pasture and 40 acres of woods and included a main house, a tenant house and various other farm buildings on five of the acres. The property was being sold to avoid foreclosure by the Federal Land Bank. The property had not been operated as a farm for about ten years and was in a state of disrepair.
 
 
 4
 Payne agreed to move on the property and help repair and maintain it in return for the right to live in the tenant house rent free and the right to graze his own small herd of cattle on the property. After the $15,000 loan was paid off, Dr. Remuzzi and Payne were to share equally in the profits from cattle raising.
 
 
 5
 The Remuzzis moved to the farm in August of 1978. Payne moved to the farm in November of 1978. He brought his Angus herd (about 30 cattle), a tractor, a bushhog, and a small combine. For about a year, Payne mended fences and bushhogged the pasture land. However, during the spring and summer of 1979, Payne moved his herd off the farm because of insufficient closed-in pastureland. The cattle returned during the fall of 1979 after more fences were mended during the summer. By early 1980, Payne began to behave strangely and irresponsibly, performing less and less work on the farm. This prompted Dr. Remuzzi to demand rent of $200 per month for the tenant house. On July 1, 1980, Dr. Remuzzi had Payne sign a promissory note for the $15,000, the money which Dr. Remuzzi had originally lent to Payne.
 
 
 6
 During the summer of 1980, Dr. Remuzzi hired some college students to work on the farm and he, himself, also mended fences to enclose pastureland for the five head of cattle which he owned. His ten-year old son fed the five head of cattle each day. Dr. Remuzzi's wife performed no farm-related work as she was pregnant. By the fall of 1980, Payne could no longer perform his work.[1] Payne's property, including his car, his tractor, and his herd, was repossessed by the local sheriff.
 
 
 7
 In the spring of 1981, Dr. Remuzzi obtained a judgment for the unpaid balance of $13,800 which Payne still owed him on the loan. The judgment has never been satisfied.
 
 
 8
 The following accounting information shows taxpayers' revenues, expenses and losses associated with Fairleigh Farm from 1978 to 1982:
 
 
 9
 Expenses
 -------------------------------- Net Income
Year Revenues Interest Taxes Other (Loss)
-------------------------------------------------------------------
1978 $1,200.00 $8,192.20 $ $8,713.18 ($15,705.38)
1979 260.00 14,837.00 705.00 22,957.00 (38,239.00)
1980 1,200.00 15,363.00 508.00 20,416.00 (35,087.00)
1981 2,715.00 15,095.00 156.00 34,275.00 (46,811.00)
1982 360.00 11,216.15 2,212.43 10,196.16 (23,264.14)
 --------- ---------- --------- ---------- -------------
Totals $5,735.60 $64,703.35 $3,581.43 $96,557.34 ($159,106.52)
 --------- ---------- --------- ---------- -------------
 --------- ---------- --------- ---------- -------------
 
 
 10
 The $34,275 of "other expenses" for 1981 included taxpayers' $13,800.00 bad debt from Payne. The revenues consisted of the following items:
 
 
 11
 Rent From Fire Hay &
Year Tenant House Timber Wood Cattle Other Total
------------------------------------------------------------------
1978 $1,200.00 $ $ $ $ $1,200.00
1979 260.00 260.00
1980 1,200.00 1,200.00
1981 1,800.00 50.00 865.00 2,715.00
1982 360.60 360.60
 ------------ ------- ------ ------- ------- ---------
Totals $4,200.00 $260.00 $50.00 $865.00 $360.60 $5,735.60
 ------------ ------- ------ ------- ------- ---------
 ------------ ------- ------ ------- ------- ---------
 
 
 12
 The $865.00 of revenue from cattle sales resulted from the sales of two sides of beef, one of which was purchased by the Remuzzis themselves. The $1,200.00 in 1980 and the $1,800.00 in 1982 from rental of the tenant house was paid by Payne.
 
 
 13
 During the same period, Dr. Remuzzi reported the following earnings from his medical practice:
 
 
 14
 Year Earnings
1978 $124,368.49
1978 138,889.00
1979 160,056.00
1980 190,661.00
1981 190,661.00
1982 218,272.29
 
 
 15
 The first question for discussion is whether the Tax Court erred when it found that the Remuzzis were not engaged in farming with the requisite purpose of making a profit.
 
 
 16
 Taxpayers may take deductions for ordinary and necessary expenses paid or incurred in carrying on a trade or business under 26 U.S.C. Sec. 162(a) or for expenses incurred "for the production or collection of income" under 26 U.S.C. Sec. 212. Out of concern that deductions of that nature be taken for legitimate businesses[2] and not for personal pleasure or to generate losses to shelter unrelated income, Congress later passed 26 U.S.C. Sec. 183, which provides, in part, that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed...."[3] Whether the activity was engaged in for profit turns on whether the taxpayer had a bona fide objective of making a profit. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir.1981).
 
 
 17
 The Treasury Regulations to Sec. 183 provide nine objective factors to be considered in determining whether an activity is engaged in for profit. The nine factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. 26 C.F.R. Secs. 1.183-2(b)(1)-(9). "None of these factors is determinative, nor is the decision to be made by comparing the number of factors that weigh in the taxpayer's favor with the number that support the Commissioner." Nickerson v. Commissioner, 700 F.2d 402, 404 (7th Cir.1983). See also 26 C.F.R. Secs. 1.183-2(b).
 
 
 18
 The burden is upon the taxpayer to show that he is engaged in an activity for profit. Faulconer, 748 F.2d at 893. Whether the Remuzzis' cattle farm is an activity engaged in for profit is a question of fact, id. at 895, and, thus, subject to the clearly erroneous standard of review. Commissioner v. Duberstein, 363 U.S. 278, 291 & n. 13 (1960); Faulconer v. Commissioner, 748 F.2d at 895. The reviewing court cannot reverse simply because it would have decided the case differently. Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed. Id.; United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948); Faulconer, 748 F.2d at 895. And the Tax Court must be reversed if it has applied the wrong legal standard. United States v. Parke, Davis & Co., 362 U.S. 29, 43-44 (1960); Faulconer, 748 F.2d at 895.
 
 
 19
 The Remuzzis complain that the Tax Court applied the wrong legal standard under Sec. 183 and that several factual determinations were clearly erroneous. We address those contentions.
 
 A.
 
 20
 The Remuzzis accurately state that Sec. 183 does not require that the taxpayer show a reasonable profit objective. Rather, a sincere and honest or bona fide profit motive is all that is required. However, the Remuzzis fail to show that the Tax Court applied the erroneous reasonable profit motive standard. They merely assert that the Tax Court must have erred because it did not recite the words "sincere and honest." The Remuzzis further criticize the Tax Court's decision because it discussed factor eight of the regulation, taxpayers' financial status, before the other factors. That, they contend, made factor eight "implicitly ... determinative." We disagree.
 
 
 21
 Although the Remuzzis attempt to argue that the Tax Court applied an excessively stringent standard in reviewing their farming activity, they merely restate the facts which they think justify a different conclusion. The Tax Court's memorandum specifically applied the nine factor test under 26 C.F.R. Sec. 1.183-2(b), thoroughly and carefully discussing each factor. Upon review, it cannot be said with definite and firm conviction that the Tax Court committed a mistake when it concluded that taxpayers, "who had substantial nonfarm income in each of the years at issue, simply preferred to live on a farm and attempted to deduct their personal expenses of maintaining and improving their domicile as business expenses." 54 T.C.M. (CCH) 1479, 1482 (1988).
 
 
 22
 Finally, taxpayers argue that the Tax Court decided three contemporaneous cases applying a less stringent standard.[4] However, the Supreme Court has observed that the fact that analogous cases reach different conclusions is to be expected in factually intensive determinations, see Duberstein, 363 U.S. at 289-91, and that such determinations "must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." Id. at 289. The three analogous cases clearly indicated that the Tax Court was impressed with the credibility of the taxpayers' testimony.
 
 B.
 
 23
 The next question asks whether the Tax Court erred in determining that Payne was a tenant on the Remuzzis' farm rather than a partner with the Remuzzis in the farming venture. The Remuzzis argue that the undisputed facts[5] indicate that Dr. Remuzzi and Payne were partners in their joint venture to establish a cattle farm and that Payne's intent to make it profitable should have been considered.[6] The Tax Court determined that there was no evidence that Payne, Remuzzis' tenant, "had the experience or expertise required to operate petitioners' farm profitably." That factual finding does not turn on the issue of whether Payne was a partner or a tenant or an employee. Once again, the Remuzzis' concern focuses on a fact which the Tax Court found disfavorably to them. The finding was not clearly erroneous.
 
 C.
 
 24
 The Remuzzis also complain that the Tax Court erroneously applied the first factor of the nine-part test, i.e., the manner in which petitioners carried on Fairleigh Farm. They contend that the Tax Court wrongly required them to have performed sophisticated financial analyses before embarking on a farm venture. However, the cases upon which taxpayers rely appear to be factually distinguishable.[7] Furthermore, the Tax Court did not require sophisticated financial analyses, but instead it found that the Remuzzis failed to inquire about basic business concerns for new enterprises, such as estimating the expenses of repairing the property they purchased which had not been farmed for ten years and was in a state of utter disrepair. The Tax Court determined that this, along with the Remuzzis' lack of effort to monitor the farm's profitability or to reduce its expenses, indicated their disregard for the farm's profitability. The Tax Court did not rely solely on the separate financial records which taxpayers did maintain for the property, although the Tax Court did negatively observe that those records were the minimum necessary to support the taxpayers' deductions for tax purposes.
 
 
 25
 Finally, the Remuzzis contest the Tax Court's determination that a bad debt which Payne owed them was a nonbusiness bad debt and not deductible. A nonbusiness bad debt is defined in 26 U.S.C. Sec. 166(d)(2) as:
 
 
 26
 a debt other than--
 
 
 27
 (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
 
 
 28
 (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
 
 
 29
 To qualify as a trade or business, a taxpayer's primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). Having already decided that Fairleigh Farm was not an activity engaged in for profit, the Tax Court found as a fact not clearly erroneous that the $13,800.00 which the Remuzzis could not collect from Payne was a nonbusiness bad debt.
 
 
 30
 Because of the strict standard of review and deference in the case law to the trial tribunal's fact-finding, the decision of the Tax Court is
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 Payne was later diagnosed as having Alzheimer's disease of which he died in 1983
 
 
 [2]
 A business must be undertaken "in good faith for the purpose of making a profit" in order for its expenses to be deductible under Sec. 162. Faulconer v. Commissioner, 748 F.2d 890, 892 (4th Cir.1984); Malmstedt v. Commissioner, 578 F.2d 520, 527 (4th Cir.1978)
 
 
 [3]
 Congress indicated that an objective evaluation should be used in determining whether an activity is engaged in for profit:
 the committee intends that an objective rather than a subjective approach is to be employed. Thus, although a reasonable expectation of profit is not to be required, the facts and circumstances (without regard to the Taxpayer's subjective intent) would have to indicate that the taxpayer entered the activity, or continued the activity, with the objective of making a profit.
 S.Rep. No. 91-552, 91st Cong., 1st Sess. 104, reprinted in 1969 U.S.Code Cong. & Ad.News 2027. Congress' intent to use an objective test was implemented through 26 C.F.R. Sec. 1.183-2(a) discussed, infra.
 
 
 [4]
 See Feldman v. Commissioner, 55 T.C.M. (CCH) 450 (1988); Roberts v. Commissioner, 53 T.C.M. (CCH) 517 (1987); and Archer v. Commissioner, 53 T.C.M. (CCH) 45 (1987)
 
 
 [5]
 Taxpayers state the undisputed evidence as follows: (1) Payne was a successful, longtime farmer; (2) he assisted the Remuzzis in selecting the farm; (3) he was Dr. Remuzzi's principal adviser; (4) he provided the majority of the livestock, labor, farm equipment and expertise to operate the farm; (5) his arrangement with the Remuzzis was typical in that area; (6) his illness could not have been foreseen by the Remuzzis; and (7) he could not be replaced
 
 
 [6]
 Taxpayers assert that this "error" infects the entire nine-factor test which the Tax Court applied by distorting the Remuzzis' (1) long-term plan for acquiring and operating their farm, (2) access to an experienced resident farm adviser, (3) arrangement with Payne to provide cost-effective farm labor and capital assets (i.e., livestock and equipment), and (4) key explanation for the initial losses (i.e., farm restoration and start-up exacerbated by the loss of Payne) from their farm operations
 
 
 [7]
 See, for example, Faulconer, 748 F.2d at 896 (formal farm budgets or projections not necessary because taxpayer could tell from his records what the expenses and profits were respecting the various aspects of the farming activity and there was no way to predict how long or how successfully a horse would race in a particular year); Archer v. Commissioner, 53 T.C.M. (CCH) at 49 (although petitioner did not maintain formal books of account, he kept a separate farm checking account which he reconciled monthly to his own records; maintained invoice files for each merchant; completed a log of expenditures for his trucking expenses; used the yearly breakdown provided by the local farm-supply cooperative to aid in accounting for his farm purchases)